# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:06CR00028 |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **MELISSA LONG**, ) | By: James P. Jones |
| ) | Chief United States District Judge |
| Defendant. ) | |

*Zachary T. Lee, Special Assistant United States Attorney, Abingdon, Virginia, for United States; Brian M. Ely, Jessee, Read, & Ely, P.C., Abingdon, Virginia, for Defendant.*

The defendant in this criminal case was convicted by a jury of separate counts of perjury, as well as obstruction of justice. Based on the evidence presented at trial, I find that two of the perjury charges are multiplicitious because the defendant's false answers to separate grand jury questions were essentially the same. Otherwise, I hold that there was sufficient evidence presented at trial to support the obstruction of justice conviction, and that the defendant's false statements at a bond hearing were material.

I

The defendant Melissa Long was convicted by a jury of obstructing justice, 18 U.S.C.A. § 1512(c) (West 200 & Supp. 2006) (Count One of the Superceding Indictment) and perjury, 18 U.S.C.A. 1623 (West 2000) (Counts Two, Three, Four and Five). She has filed a Motion for Judgment of Acquittal and a Motion for New Trial arguing that the evidence was insufficient to prove Count One; that Counts Three and Four of the indictment were multiplicitious, and that the false statements charged in Count Five were immaterial. The motions have been fully briefed and argued and are now ripe for decision.

As shown by the evidence presented at trial, the defendant appeared as a witness before a grand jury of this court on March 21, 2006. The grand jury was investigating a murder-for-hire plot allegedly organized by Michael Bear, the defendant's stepfather. Bear had been initially arrested on August 15, 2005, on federal drug and weapons charges. While in custody at the Bristol, Virginia, jail, between August 17 and September 2, 2005, Bear made at least four collect telephone calls to the defendant, who was at his residence in Sneedville, Tennessee. These telephone calls were monitored and recorded by the authorities. During the calls, the defendant and Bear discussed several matters relating to money, items he needed while incarcerated, and the legal charges he was facing in federal court. However,

the two also used codewords in several conversations, which the government contends referred to the murder plot and the targets of that plot.

Specifically, Bear requested that the defendant contact a man named Keek regarding performing "backhoe jobs." The first mention of Keek made by Bear occurred on August 17, 2005. In this conversation, Bear told the defendant that when she talked to Keek she was to tell him that "he needs the eyes that see in the night" and "to get somebody that can use 'em." (Gov't Ex. 5 at 1.) The defendant agreed and confirmed with Bear the messages that she was to pass along to Keek when she talked to him.

The next conversation between the two occurred hours following Bear's bond hearing before a magistrate judge of this court on August 18, 2006. The defendant had testified at the hearing and recounted her concern to Bear that her testimony had been inadequate to secure his release. At the hearing, in response to the judge's questioning, the defendant testified that Bear had never provided her with drugs and that he had never been around when she was using drugs. However, at her trial, the defendant admitted that this had been a false statement and that Bear had in fact supplied her with drugs on several occasions.

During this same phone conversation, Bear again mentioned Keek and that the defendant needed to contact him. The defendant responded that she had tried to

contact Keek five times during her return trip to Sneedville, Tennessee, from the bond hearing. Bear further stressed that the defendant needed to contact Keek and relayed another set of messages for her to pass to him.

Bear told the defendant that she was to tell Keek that Bear had three to four "backhoe jobs" for him. In response to this instruction, the defendant replied, "Okay and he's going to know what that means?" (Gov't Ex. 6 at 7.) Bear responded, "Yeah and they have to be done in the next thirty days before I go to the grand jury." (*Id.*)

After briefly discussing another matter, Bear again brought up the matter of "backhoe jobs." Without prompting, the defendant made reference to three persons whom she called "H," "M," and "C." Bear confirmed the specific people the letters referred to and mentioned one more, "J.D." He also instructed the defendant that "they have to be done by the thirtieth." (*Id.* at 9.) The defendant asked, "What about, what about C and you know, the other person?" (*Id.*) She then asked, "Okay but what about, you know, the woman?" (*Id.*) Bear responded that she had all the information she needed and that "Keekie" would know what to do.

Later in the conversation, Bear mentioned that he had sent an envelope to the defendant from jail that contained three letters—one for her, one for her mother, and one for Keek. Bear repeatedly instructed the defendant that she was not to open or

- 4 -

read the letter for Keek. The defendant promised not to read the letter and agreed to send it to Keek when she reached him. Bear then told the defendant, "you probably should drive back to the Shell station and try to get a hold of him tonight." (*Id.* at 20.) He also reminded her of the need to move quickly because the grand jury would be meeting in thirty days.

The next recorded phone conversation between the defendant and Bear occurred on August 23, 2005. The two again talked about contacting Keek. Although the defendant admitted that she had not been able to talk to Keek because she had not been able to leave the house, she said that her mother had talked to him. Bear then instructed the defendant to attempt to call Keek again that night.

The final recorded phone conversation occurred on September 2, 2005. In this conversation, the defendant told Bear that her mother had been trying to call Keek for several days and that there had been no answer. The defendant then stated to Bear that she believed Keek had just "kissed you off" because "he's not answering, not keeping in touch, nothing." (Gov't Ex. 8 at 1.)

On March 21, 2006, the defendant was called to testify before a grand jury of this court regarding her knowledge of Bear's plot to have certain witnesses against him murdered. During her testimony, she confirmed that the codewords "backhoe jobs," as used by Bear, meant killing and burying people. However, the defendant

stated that she had never tried to call a person named Keek; that she did not know how to contact Keek; and that she did not remember being told to contact Keek by Bear. She stated that she believed a "blond-headed guy" she had seen at her mother's house one time before Bear's arrest might have been Keek. (Gov't Ex. 3 at 4-5.) When asked whether the letters used in the recorded conversation referred to individuals, the defendant admitted Bear frequently referred to certain people using such letters and described the people she believed those letters referenced. However, the defendant denied knowing the people Bear might have been referring to when he talked about "backhoe jobs." When pressed by a grand juror, she testified such persons could have been "whoever he [Bear] thought snitched on him or whatever." (*Id.* at 23.)

At two different times during her grand jury appearance, the defendant also testified that she did not remember Bear telling her the persons that he had wanted the "backhoe jobs" performed on. The defendant was indicted for obstruction of justice and perjury for her false statements before the grand jury as well as one count of perjury for her testimony at Bear's bond hearing.

At trial, the defendant argued that the false statements she made under oath at Bear's bond hearing on August 18, 2005, were not material because the charges he faced carried a presumption of pre-trial confinement. She also contended that any

conflicts between her grand jury testimony and the tape recorded telephone conversations were due to the fact that she had been a functioning alcoholic during that time and therefore had no specific memory of those calls or their content. The jury returned a verdict of guilty on all counts.

II

The defendant challenges her conviction under Counts Three and Four. She argues that these counts are multiplicitious because they cover a single offense. In particular, the defendant argues that the government has charged her with two counts of perjury for one criminal act.

"Multiplicity is the charging of a single offense in more than one count." *United States v. Segall*, 833 F.2d 144, 146 (9th Cir. 1987). In the context of perjury, the doctrine of multiplicity prevents the government from bringing numerous criminal counts against a defendant by repeatedly asking the same question in the same proceeding. In essence, multiple false statements made by a defendant constitute only one criminal offense where those statements are the same and are made in response to the same question or questions.

Where false statements form the basis of multiple criminal counts, there is a two part inquiry undertaken to determine whether those counts are multiplicitious.

The first inquiry is whether the defendant was asked the same question and gave the same answer. If so, the counts still may not be multiplicitious if the government suffered some additional harm from the repeated false statement that it did not suffer from the initial one. *United States v. Salas-Camacho*, 859 F.2d 788, 791 (9th Cir. 1988); *see also United States v. Olsowy*, 836 F.2d 439 (9th Cir. 1988).

Here, Counts Three and Four charged the defendant with two separate acts of perjury before the grand jury on March 21, 2006. In regard to Count Three, the government alleges that the defendant committed perjury during the following exchange before the grand jury:

> Q. So, backhoe jobs to you meant killing people and burying 'em?
>
> A. Right.
>
> Q. And did he make any specific references as to who he wanted those backhoe jobs?
>
> A. No.
>
> Q. He did not ever make that reference to you?
>
> A. Not, not that I remember, no, huh-uh.

(*Id.* at 16.)

The defendant was asked later during her appearance before the grand jury a variation of the question she had previously answered. In regard to Count Four, the

- 8 -

government alleged that the defendant committed a separate act of perjury as a result of her answer to the following questions:

> Q. Did you, did you know who your step-father was referring to when, when he talked about the backhoe? Who was, who was he talking to you about when he was referring to the backhoe?
>
> A. I'm really not sure.
>
> Q. But what, what's your speculation? You don't have to be sure.
>
> A. My speculation would be whoever he thought snitched on him or whatever.
>
> Q. And who was that in your opinion? Who was it?
>
> A. I, I'm really not sure.

(*Id.* at 23.)

If the defendant was asked essentially the same question in both portions of her grand jury testimony that are at issue, then Counts Three and Four may be considered multiplicitious. Although the questions asked in Count Three were not identical to the questions asked in Count Four, the information sought to be elicited from the defendant was identical—the identity of potential targets of a murder-for-hire scheme.

Furthermore, her answers were essentially the same because she stated that she did not know who Bear was referring to when he used the codeword "backhoe job."

- 9 -

By giving the same answers to what are essentially the same questions, the defendant has been charged with two separate counts of perjury.

These two sets of questions and answers were given during one grand jury appearance. There is no indication that the defendant's response to the same questions that she had been previously asked "impair[ed] the operations of the government" or prejudiced the government in any additional way. *Salas-Camacho*, 859 F.2d at 791. Once the defendant misled the grand jury, repeating the lie on the same day and at the same proceeding, there was no additional harm to the government. *See Olsowy* 836 F.2d at 443. Without some indication that the defendant's repeated false statement caused additional prejudice to the government not sustained by the first false statement, the government has failed to demonstrate that the conduct at issue was truly a separate offense not covered by Count Three of the indictment.

The government may not punish the defendant twice for the same criminal offense. Where a single offense has been charged in multiple counts, the proper remedy is not a new trial or a judgment of acquittal on all the counts at issue. *See United States v. Burns*, 990 F.2d 1426, 1438 (4th Cir. 1993). Rather, "the appropriate remedy is to vacate all of them but one." *Id.* (citing *Ball v. United States*, 470 U.S.

- 10 -

Case 1:06-cr-00028-JPJ-PMS   Document 70   Filed 01/29/07   Page 10 of 17   Pageid#: 294

856, 864-65 (1985)). Since the conduct charged in Count Three subsumes the conduct charged in Count Four, Count Four will be vacated.

III

Next, as to Count One, the defendant argues in her Motion for Acquittal that there is insufficient evidence to show that her false statements before the grand jury on March 21, 2006 amounted to obstruction of justice. Specifically, the defendant argues that the government failed to prove that her false testimony thwarted the grand jury in the performance of its duties.

To be found guilty of obstruction of justice under 18 U.S.C.A. § 1512(c)(2) the government must show that the defendant (1) knowingly; (2) corruptly obstructed, influenced and impeded, or attempted to do so; (3) an official proceeding. A defendant's misstatements and omissions before a grand jury coupled with the requisite mental state constitute obstruction of justice under § 1512(c)(2).[1]

---

[1] Section 1512(c)(2) was added to the United States Code in 2002 as part of the Sarbanes-Oxley Act of 2002. Section 1503 remains on the books and nearly every case dealing with the crime of obstruction of justice is an interpretation of §1503. Sections 1503 and 1512 are distinct statutes. Although it is likely that Congress intended the scope of § 1512(c)(2) to be broader in scope than § 1503, there is no indication that Congress intended there to be any difference in the mens rea requirements of the two statutes. Therefore, cases dealing with § 1503 are instructive in dealing with § 1512(c) and the issues that this statute presents in this case.

The predicate acts for the crime of obstruction of justice charged in Count One of the indictment were the false statements made by the defendant during her appearance before the grand jury. Although the same false statements formed the basis of the three perjury counts that the defendant was convicted of, perjury and obstruction of justice are two separate offenses. *See Blockburger v. United States* 284 U.S. 299, 304 (1932) (holding that if "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."). Thus, the same predicate acts, namely the false statements made by the defendant before the grand jury, could constitute two separate criminal offenses—obstruction of justice and perjury.

In deciding a motion for acquittal based on sufficiency of the evidence, the evidence and all inferences therefrom must be viewed in a light most favorable to the government. *See United States v. Dominguez*, 604 F.2d 304, 310 (4th Cir. 1979). False statements alone before a grand jury do not necessarily amount to obstruction of justice. Although perjury can constitute the actus reus of an obstruction of justice charge, it alone is not sufficient. *United States v. Grubb*, 11 F.3d 426, 437 (4th Cir. 1993). Rather, the government must also prove that "the false statements given, in some way, either obstructed or were intended to obstruct the due administration of

justice." *Id.* (footnote omitted). In this instance, there is no question that the acts at issue are sufficient to prove a charge of obstruction of justice. The only question is whether these acts were undertaken by the defendant with the requisite criminal intent.

The evidence, taken in a light most favorable to the government, indicates that the defendant knowingly made false statements before the grand jury with the intent to impede its investigation into Bear's murder-for-hire scheme. The defendant's own conversations with her stepfather elucidate her intent to obstruct the grand jury process.

In particular, on no less than four occasions, Bear and the defendant had telephone conversations regarding the need to contact an individual named Keek in order to commence the killing of persons adverse to Bear's interests. Bear described such persons as threats to him because he believed they were cooperating with the government, and he believed that their appearance before the grand jury was imminent.

The evidence revealed that the defendant was more than just a passive listener during the recorded conversations. In fact, during one conversation, without prompting and by her own initiative, the defendant named the individuals who were the subjects of the plot. During the recorded conversations, Bear repeatedly

admonished the defendant that the "backhoe jobs" had to be completed before the grand jury met. The defendant also confirmed that she had taken affirmative steps that were intended to further the plot.

The sum of the conversations between Bear and the defendant revealed that their ultimate purpose was to prevent cooperating witnesses from testifying before the grand jury. Considering this background, it is not difficult to infer that the defendant's false statements regarding the specifics of those recorded conversations were similarly calculated to impede the grand jury's investigation. The facts and circumstances surrounding the defendant's grand jury appearance illuminate her purpose for testifying as she did. Accordingly, the government presented sufficient evidence for the jury to conclude that the defendant possessed the requisite mental state to be guilty of violating § 1512(c)(2).

Contrary to the defendant's assertion, the grand jury investigation need not have been actually thwarted by the defendant's false statements. It is inconsequential that the grand jury might have completely disregarded the defendant's testimony. There is no requirement that the government show that the grand jury actually relied on the misstatements and altered its investigation accordingly. Rather, an endeavor to obstruct can form the basis of an obstruction of justice charge. *United States v. Williams*, 874 F.2d 968, 981 (5th Cir. 1989). Justice need not actually have been

obstructed. *Id.* Proof that the false statements were intended to obstruct is sufficient. *Grubb*, 11 F.3d at 437.

Here, the testimony in question dealt with issues that were fundamentally important to the grand jury's investigation into the conspiracy to murder potential witnesses. In particular, the defendant's false statements regarding her knowledge of the identity of the targets and the identity of Keek were at the heart of the conspiracy being investigated. These matters were not simply collateral to the grand jury's investigation; they were central to it. Such statements certainly had the capacity to affect the outcome of the grand jury's investigative proceedings. It is immaterial whether the grand jury actually placed any credence in these statements.

Accordingly, the defendant's Motion for Acquittal as to Count One will be denied.

IV

Although the defendant has admitted that she testified falsely before the magistrate judge at Bear's bond hearing, she asserts her conviction on Count Five should be vacated because her false statements were immaterial. She argues that her testimony did not influence the judge's decision regarding her stepfather's bond.

Perjury is a material false statement given under oath by a witness with the intention to deceive. *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). A critical element of a perjury charge is the materiality of the false statement at issue. "[A] concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal citations omitted).

The charges that were the subject of the bond hearing carry a presumption of pre-trial detention. *See* 18 U.S.C.A. § 3142(e) (West 2000 & Supp. 2006). The defendant argues that this presumption shows that her testimony was of no consequence to the ultimate decision made at the bond hearing. However, the defendant misconceives the meaning of material, as used in the context of a charge of perjury. "It is irrelevant whether the false statement actually influenced or affected the decision-making process of the agency or fact finding body." *Sarihifard*, 155 F.3d at 306 (internal citation omitted). The defendant's false statement that Bear never provided her with drugs nor was in her presence when she was using drugs was calculated to secure her step-father's release pending trial. Although there was a presumption against Bear's release, the statements were uttered in an attempt to help overcome that presumption. The court could have used the defendant's testimony as

a basis for releasing the defendant; the fact it did not do so is inconsequential to assessing the materiality of those statements. Therefore, the defendant's motion as to Count Five will be denied.

V

For the reasons stated, it is **ORDERED** as follows:

1. The defendant's Motion for Acquittal is granted in part and denied in part;

2. The defendant's conviction of Count Four is VACATED; and

3. The defendant's Motion for New Trial is DENIED.

ENTER: January 29, 2007

/s/ JAMES P. JONES
Chief United States District Judge